UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CHRISTOPHER N. MILLER,<br><br>    Petitioner,<br><br>v.<br><br>KENNETH QUINN,<br><br>    Respondent. | CASE NO. C06-5694RJB<br><br>REPORT AND RECOMMENDATION<br><br>Noted for July 17, 2009 |

The underlying Petition for a Writ of Habeas Corpus has been referred to United States Magistrate Judge J. Richard Creatura pursuant to 28 U.S.C. § 636(b)(1)(A) and 636 (b)(1)(B), and Local Magistrates Rule MJR3 and MJR4. Petitioner is seeking federal habeas relief, pursuant to 28 U.S.C. § 2254, from state jury convictions for aggravated murder in the first degree, rising out of the Superior Court for Lewis County, Washington. Petitioner was sentenced to life in prison without the possibility of early release, and he is currently in custody at the Washington State Reformatory in Monroe, Washington.

REPORT AND
RECOMMENDATION - 1

# FACTUAL AND PROCEDURAL BACKGROUND

This matter is back before the court upon remand from the Ninth Circuit (Miller v. Quinn, No. 07-35531 (9th Cir. January 9, 2009)). The court had previously held that Petitioner had failed to properly exhaust his federal habeas claims, but on appeal the Ninth Circuit found Petitioner had properly presented two of his claims to the state court. Accordingly, this matter is before the court to address the following two claims assigned by Petitioner.

(1) Whether due process requires production and access to DNA evidence found on the victim as well as access to relevant state and federal DNA databases; and

(2) Whether the prosecutor wrongfully induced Petitioner's confession by giving him misleading legal advice.

As noted in the court's previous report and recommendation, Petitioner's conviction is based on the murder of Dixie Harkcom on October 17, 2000. Ms. Harkcom died of a single gunshot wound to the back of her head. At trial, Petitioner testified and stated he did not kill Mrs. Harkcom and did not have anything to do with her death. The jury did not believe this testimony. Instead, the jury convicted Petitioner based on the evidence presented at trial, which included several audio and video taped statements of Petitioner. In each of these recordings, Petitioner stated, under oath, that he was intimately involved with Ms. Harkcom's death.

The Washington State Court of Appeals summarized the case as follows:

> On several occasions between January and April of 2001, a Lewis County detective spoke with Miller in the Cowlitz County jail, where Miller was being held on unrelated matters. Although Miller initially denied any involvement in Harkcom's murder, he eventually implicated himself and three others, stating that Harkcom was murdered after she discovered them shooting up with methamphetamine in a car parked beside the road as she walked home from work.
>
> The jury heard two audio taped statements that Miller made and viewed a videotaped reenactment of the crime that he directed. These statements contain internal inconsistencies concerning Miller's participation in the murder and vary in their

REPORT AND
RECOMMENDATION - 2

descriptions of Miller's actions.  They each set forth, however, the same basic chain of events: Harkcom discovered the men shooting up with drugs in a car as she walked home along a back road.  Recognizing Miller, she approached and scolded him.  Fearing that she would call the police, the men shot at Harkcom first to frighten her and then to kill her.  In each statement, Miller claimed that he touched her wrist to feel her pulse and that he took money from her pants pocket.  He also said that Harkcom struggled with the men in a muddy area, which resulted in both mud and blood being transferred to the car.

At trial, Miller recanted his earlier statements, saying that he had admitted involvement in Harkcom's murder to get a "deal" on his less serious Cowlitz County charges.  There was no physical evidence connecting Miller with the murder, and much of the evidence that was submitted was inconsistent with Miller's pretrial statements.  Witnesses testified that Harkcom's clothing was clean, except for some mud on the back of her pants; that she had no defensive wounds showing that a struggle occurred; that the only blood on the body was in Harkcom's hair, ears and nose; and that no signs of mud or blood were found in the car Miller identified as the one involved in the murder.

There were also some consistencies between Miller's statements, however, and the evidence associated with the murder.  Miller said that Harkcom carried a shopping bag and he accurately described the contents of the bag.  He also said that she was shot from behind; that he encountered her in the area where the body was found; that she was shot with a .22 long-barrel gun; and that the ammunition was a Super-X brand.  Officers found a Super-X shell casing in the area Miller described.

At trial, Miller contended that this corroborating information was either the result of guesswork or of being fed information by law enforcement.  He called witnesses who contradicted his pretrial statements regarding the involvement of the other suspects, his activities on the day of the murder, and the vehicle that he claimed to have used.  Defense counsel's closing argument focused on the inconsistencies between the testimony introduced by both the State and the defense during trial and Miller's pretrial statements.

The jury found Miller guilty of aggravated first degree murder on March 21, 2002.  As aggravating factors, the jury found that Miller was a major participant in the acts that caused Harkcom's death; that he committed the murder to conceal the identity of a person committing the crimes of first degree assault and possession of methamphetamine.  The jury also found that Miller was armed with a firearm at the time of the murder.

Exhibit 14 at 2-3, attached to Respondent' Submission of State Court Record.

After the trial, in September 2002, the Lewis County Sheriff's Office submitted various items of evidence for DNA testing at the Washington State Patrol Crime Laboratory.  A forensic scientist took samples from the evidence submitted, and on March 19, 2003, he reported:

REPORT AND
RECOMMENDATION - 3

> An indication of a trace male DNA was observed on the right sleeve cuff of the sweatshirt (item 34). No interpretable DNA typing profile was obtained from this trace. However, no evidence of DNA from Gary Lindsey (item 1L6), Christopher Miller (profile from the convicted felon databank), or Dale Ziolkowski (profile from the convicted felon databank) is apparent in this trace.

Exhibit 11, Petitioner's Personal Restraint Petition, attached to Respondent' Submission of State Court Record. On May 29, 2003, the trace DNA was compared to another suspect's DNA (Gordon Grasser) but the results were negative. Id.

## EVIDENTIARY HEARING NOT REQUIRED

In its Order Directing Service and Response, the court directed respondent to state whether or not an evidentiary hearing was necessary. The function of an evidentiary hearing is to try issues of fact; such a hearing is unnecessary when only issues of law are raised. *See, e.g.*, Yeaman v. United States, 326 F.2d 293 (9th Cir. 1963). The undersigned magistrate judge concludes that there are no relevant factual disputes to resolve in order for the Court to render its decision in this case. Accordingly, an evidentiary hearing was not conducted.

## DISCUSSION

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. Engle v. Isaac, 456 U.S. 107 (1983). Section 2254 explicitly states that a federal court may entertain an application for writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the constitution or law or treaties of the United States." 28 U.S.C. § 2254(a)(1995). The Supreme Court has stated many times that federal habeas corpus relief does not lie for mere errors of state law. Lewis v. Jeffers, 497 U.S. 764 (1990); Pulley v. Harris, 465 U.S. 37, 41 (1984); Estelle v. McGuire, 502 U.S. 62 (1991).

A habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either (1) resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. §2254(d). Further, a determination of a factual issue by a state court shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

Before granting relief, the district court must first determine whether the state court decision was erroneous. Van Tran v. Lindsey, 212 F.3d 1143, 1155 (9th Cir. 2000), *cert. denied*, 121 S.Ct. 340 (2000). The district court must then determine whether the state court decision involved an unreasonable application of clearly established federal law. Id. The district court may grant habeas relief only if it finds the state court decision was unreasonable. Van Tran, 212 F.3d at 1153; Weighall v. Middle, 215 F.3d 1058, 1063 (9th Cir. 2000).

### A.   *Petitioner's Right To Due Process Has Not Been Violated*

In his Personal Restraint Petition submitted to the state courts, Petitioner argues he should be given "the opportunity to use DNA evidence found on the victim's sleeve to establish whether there is new evidence implicating an unknown suspect that might serve as newly discovered evidence that would justify post-conviction relief, just as the State would have been permitted to use the evidence in prosecuting the case against him had it been inculpatory." Exhibit 11 attached to Respondent' Submission of State Court Record.

The Due Process Clause of the Fourteenth Amendment provides that no state shall deprive "any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Substantive due process protects individuals against arbitrary and unreasonable government action which deprives any person of life, liberty, or property. Kawaoka v. City of

Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994). Procedural due process does not protect the actual deprivation of the life, liberty, or property in question, but ensures that individuals are given an adequate opportunity to challenge the government action. Carey v. Piphus, 435 U.S. 247, 259 (1978).

Due process rights are violated when the state fails to disclose "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S 83, 87 (1963). The prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused, and even an inadvertent failure to disclose may constitute a violation. United States v. Agurs, 427 U.S. 97, 107 (1976). Brady and its progeny "illustrate the special role played by the American prosecutor in the search for truth in criminal trials." Strickler v. Greene, 527 U.S. 263, 281 (1999). The State's duty to comply with its obligations under Brady is an ongoing one, and continues to bind the prosecution even after conviction and sentencing. Thompson v. Goldsmith, 979 F.2d 746, 749-50 n.2 (9th Cir. 1992).

The State Court of Appeals court addressed Petitioner's due process claim, stating, at length, the following:

> Miller now claims that the male DNA found on Harkcom's sweatshirt constitutes newly discovered evidence that requires either a new trial or, at the least, an evidentiary hearing. He also claims that he has the right to have these DNA results run through the state and federal DNA databases to discover whether they match the DNA profiles of any other felon.
>
> A new trial will be granted on the basis of newly discovered evidence if a petitioner shows that the evidence will probably change the result of the trial; was discovered since the trial; could not have been discovered before trial by the existence of due diligence; is material; and is not merely cumulative or impeaching. *In re Personal Restraint of Brown*, 143 Wn.2d 431, 453 (2001). The absence of any one of these five factors is grounds for denying the request for a new trial. *Brown*, 143 Wn.2fd at 453.

REPORT AND
RECOMMENDATION - 6

Miller contends that the DNA test results excluding him from a match are material evidence that would probably change the result of the trial because his three statements concerning the murder were inconsistent and because much of the physical evidence introduced at trial contradicted those statements. Although he recognizes that the DNA results do not establish his guilt or innocence, he argues that they have significant probative value and would probably change the verdict because they support his testimony and cast doubt on his pretrial statements regarding the physical contact between the four suspects and Harkcom. Miller reasons that because the State had no other physical or testimonial evidence tying him to the crime, one more piece of evidence in his favor carries much more weight than it might in a case with significant additional evidence of guilt. As support, Miller cites *People v. Dodds*, 801 N.E.2d 63 (Ill. App. 203).

[Omitted].

The State points out that the jury considered ample contradictory evidence between Miller's statements and the physical evidence and found, despite the inconsistencies, that his pretrial statements were credible. The State also points out that not all contact results in a DNA transfer, as evidenced by the fact that none of Harkcom's DNA was found on her jeans or one of her socks. Miller himself cites a law review article stating that DNA exclusions can be misleading because the absence of DNA does not necessarily mean that the perpetrator was not in contact with the victim. Comment, *Motions for Postconviction DNA Testing: Determining the Standard of Proof Necessary in Granting Requests*, 31 Cap. L. Rev. 243, 264 (2003).

We agree with the State that given the diversity of facts presented at trial, and the extent to which the defense attempted to undermine Miller's pretrial statements, there is little probability that DNA evidence excluding him as the source of male DNA found on Harkcom's sweatshirt cuff would have changed the result of the trial. Consequently, that DNA evidence does not constitute newly discovered evidence that entitles Miller to either a new trial or an evidentiary hearing.

In possible anticipation of that conclusion Miller also argues that he is entitled to use the DNA results to determine whether that is evidence implicating an unknown suspect that might serve as newly discovered evidence justifying post-conviction relief. More specifically, he seeks an order directing Lewis County to request a comparison of the male DNA found on Harkcom's cuff to the profiles found in the Washington DNA database and CODIS, the federal database created by the FBI. [Footnote omitted] Miller contends that if that DNA matches a previously unsuspected felon, that information would exonerate him.

In making this request, Miller contends that he has a due process right to submit existing biological evidence to further testing and analysis to determine its potential exculpatory value. He argues that he must be allowed access to

REPORT AND
RECOMMENDATION - 7

evidence that has the "strong potential to conclusively illustrate his innocence" and cites as support *Brady v. Maryland*, 373 U.S. 83(1963).

*Brady* stands for the proposition that a defendant has a constitutional right to be informed of exculpatory information known to the State. *Dabbs v. Vergari*, 570 N.Y.S.2d 765, 767 (N.Y. Sup. Ct. 1990). Thus, "preserved evidence having a high exculpatory potential should be discoverable after conviction." *Sewell v. Indiana*, 592 N.E.2d 705, 708 (Ind. App. 1992) (*citing Dabbs*, 570 N.Y.S.2d at 767-68). The State's failure to submit material for DNA analysis may implicate its obligation under *Brady*. *Commonwealth v. Brison*, 618 A.2d 420, 424 (Pa. Super. 1992).

Each of the three cases cited above involved rape convictions and the defendants' desire to have semen collected from each victim submitted to DNA testing. In each case, the court held that because the desired testing had a high exculpatory potential, DNA testing and the release of the results to the defendants outweighed the State's interest in finality. In ordering DNA testing, the *Brison* court quoted the *Sewell* court's recognition of the scope of relief required under *Brady*: "'*Brady* is implicated in post-conviction requests for forensic tests only where a conviction rested largely upon identification evidence and advanced technology could definitively establish the accused's innocence.'" *Brison*, 618 A.2d at 424 (*quoting Sewell*, 592 N.E.2d at 707); *see also State v. Thomas*, 586 A.2d 250, 254 (N.J. Super 1991) (ordering DNA testing of rape kit because "there exists a way to establish guilt or innocence once and for all").

The DNA testing here did not reveal such exculpatory evidence, and it does not appear that comparison of the test results with the profiles in either the state or federal databanks would further establish Miller's innocence. [Footnote omitted]. Even if the DNA found on Harkcom's cuff did match that of some other felon, such a result would not exonerate Miller. Rather, it arguably would serve simply to "muddy the waters." *See Watkins v. State*, 155 S.W.3d 631, 633 (Tex. App. 2005). The Watkins court held that unless the desired DNA test results would conclusively outweigh all other evidence of the convicted's guilt, post-conviction DNA testing is not in order. 155 S.W.3d at 634.

There is no constitutional right to discovery. *People v. Sterling*, 787 N.Y.S. 2d 846, 853 (N.Y.Cy. Ct. 2004); *In re Personal Restraint of Gentry*, 137 Wn.2d 378, 391 (1999). Prisoners seeking postconviction relief are allowed discovery only if they can show good cause to believe the discovery would entitle them to relief. *Gentry*, 137 Wn.2d at 391. As support for that position, the court in *Gentry* cited two federal cases holding that an expert should be appointed to perform DNA testing if the defendant consistently maintained his innocence, the victim's identification testimony was challenged, and the testing could conclusively prove the defendant's innocence. *Gentry*, 137 Wn.2d at 392; *see also Osborne v. State*, 110 P.3d 986, 995 (Alaska App. 2005) (defendant seeking post-conviction DNA testing must satisfy that three-part test).

REPORT AND
RECOMMENDATION - 8

> Post-conviction requests for DNA testing are now governed by statue in Washington, and the recent rewriting of the pertinent statute is instructive here. RCW 10.73.170, as revised in 2005, provides that a motion for DNA testing must show the likelihood that the DNA evidence would demonstrate innocence on a more probable than not basis. This is a slightly lower standard than that set forth in *Gentry* but still appears to be a standard that Miller cannot satisfy. As stated, even if the further analysis he requests showed a match between the DNA on Harkcom's cuff and another felon, that discovery would not exonerate or even probably exonerate Miller. This court can perceive of numerous instances in which a grocery store check-out clerk could come into contact with someone having a criminal record. Consequently, Miller's case seems more similar to the situation in *Sterling*, where the court denied post-conviction DNA testing despite the defendant's recantation of his confession at trial where he failed to demonstrate a reasonable probability that a more favorable outcome at trial would have resulted had DNA test results been introduced. 787 N.Y.S.2d at 854-55.
>
> We do not see that the DNA results obtained rise to the level of newly discovered evidence that warrants a new trial or an evidentiary hearing. Nor do we see that further analysis of those results would probably demonstrate Miller's innocence.

Exhibit 14, at 3-4 and 7-10.

After reviewing the state court decision and relevant law the undersigned finds the state court decision was not erroneous, did not involve an unreasonable application of the facts presented to the state court, nor contrary to clearly established federal law.  Due process entitles a defendant to the post-conviction discovery of exculpatory evidence so long as there is a reasonable probability that the evidence would undermine the confidence in the outcome.  <u>Brady v. Maryland</u>, *supra*; <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985).  Here, the state court reasonably concluded that the evidence/discovery sought by Petitioner – comparing the DNA results to the felon databases – would not produce evidence that would undermine the validity of the jury's finding of guilt.

Denying Petitioner's due process claim the state court emphasized "the diversity of facts presented at trial" and the "high exculpatory" standard used in post-conviction DNA cases.  The

REPORT AND
RECOMMENDATION - 9

federal courts have also utilized a "high exculpatory" standard in post-conviction DNA habeas cases. In Thomas v. Goldsmith, 979 F.2d, 749-50 (9th Cir. 1992), the court required disclosure of potentially-exculpatory semen evidence in a habeas corpus proceeding where testing of the evidence was potentially material to a "gateway" showing of actual innocence. Similarly in Majoy v. Roe, 296 F.3d 770 (9th Cir. 2002), testing and an evidentiary hearing were necessary to permit an opportunity to meet "the exacting gateway standard" of making an actual innocence claim under Schlup v. Delo, 513 U.S. 298 (1995). Arguably, the federal "gateway" standard is higher than the "high exculpatory" standard utilized by the state court.

A review of the facts presented at trial further support the state court's analysis. The undersigned has reviewed the record, including several portions of the trial court record, transcripts of Petitioner's pretrial interviews with police officers, and Petitioner's testimony recanting those earlier admissions. Petitioner's statements to the police during the investigation are compelling. Each time a statement was made Petitioner acknowledged his right to remain silent and he provided specific details about the events on October 17, 2002, when Dixie Harkcom was murdered. Each statement describes how Petitioner was involved in the process of getting high on methamphetamine in an automobile, when Ms. Harkcom walked by and witnessed what was happening. Because she witnessed what they were doing and called them drug addicts, threatened to call the cops, Petitioner stated he just wanted to scare her and he pulled out a gun. The emotions went out of control and Ms. Harkcom was shot and killed.

At trial Petitioner recanted his earlier statements and confession. He explained that he made the statements with the intent on getting a deal, a lesser charge or sentence, on an unrelated pending criminal matter in Cowlitz County. During closing argument the prosecutor focused the jurors' attention on the details of the crime (a bag the victim was carrying, the contents of the

bag, and type of pants the victim was wearing) and Petitioner's statements to the police officers. The prosecutor argued Petitioner's ability to describe the details of the crime accurately to the police was more than just a lucky or educated guess, as Petitioner claimed in his self-defense during his testimony. Petitioner's attorney attacked the state's evidence and pointed out many inconsistencies, and asked the jury to disregard Petitioner's taped statements made to the police in which he admitted to participating in the murder of Dixie Harkcom. The jury rejected Petitioner's testimony at trial and found him guilty of the crime. In sum, the evidence at trial was quite diverse, as described by the state court of appeals.

Given the evidence at trial, described above, and the limited usefulness of the DNA evidence being sought, it was not unreasonable for the state court of appeals to conclude that Petitioner's due process rights were not being violated. Petitioner is seeking to have trace of male DNA evidence found on the sleeve of Ms. Harkcom, compared with DNA databases maintained by state and federal agencies. The DNA has already been compared to Petitioner's DNA, in addition to other potential participants, indicating no match. If the comparison is made to a felony database and a search comes up with a match, the undersigned cannot find that such evidence would be a "gateway" to actual innocence. It would not produce anything more than an individual with a past criminal record who happened to know or be in contact with Dixie Harkcom's clothing at some point. If that evidence had been available and presented at Petitioner's trial, it would have been weighed, just as the other conflicting evidence, against the statements made by Petitioner when he confessed to being involved in the murder of Ms. Harkcom. It is not highly exculpatory evidence and it is not evidence that indicates actual innocence.

In sum, the Court should reject Petitioner's argument that his due process rights were violated when the state court denied him the opportunity to obtain the DNA results and make a comparison of those results with the felon databases.

*B. Petitioner's Statements Were Properly Admitted*

A confession must be suppressed, even absent a *Miranda* violation, when the totality of the circumstances demonstrates that the confession was involuntary. Dickerson v. United States, 530 U.S. 428, 434 (2000). However, if interrogators obtained a confession after *Miranda* warnings and a valid waiver, the confession was likely voluntary. *See* Missouri v. Seibert, 542 U.S. 600, 608-09 (2004) ("[G]iving the warnings and getting a waiver has generally produced a virtual ticket of admissibility."); Berkemer v. McCarty, 468 U.S. 420, 433 n. 20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare").

Petitioner argues his statements were involuntary and should have been suppressed, because he was misled to believe that he could not legally be charged with a homicide unless he fired the fatal shot. During one of the interviews with the police, Prosecuting Attorney Jeremy Randolph was brought to the meeting to explain the consequences of various levels of involvement to Petitioner. Petitioner testified that after listening to the prosecutor he was left with the impression he could only be charged with rendering criminal assistance (a class C felony) if his actions showed he assisted or encouraged the actual shooter in committing the crime. Consequently, after talking to the prosecutor Petitioner disclosed to the officers for the first time that he was present at the killing, but maintained that Gordon Grasser fired the fatal

shot. Petitioner argues his statements were induced by the prosecutor's misleading legal advice and should have been suppressed or precluded from being admitted as evidence at the trial.

The issue was addressed by the State Court of Appeals on direct appeal. The Court of Appeals wrote the following:

> On October 17, 2000, Dixie Harkcom was shot and killed in Lewis County. On several occasions between January and April of 2001, Detective Wetzold spoke with Miller in the Cowlitz County jail, where Miller was being held on unrelated matters. On some of these occasions, Wetzold was assisted by Detective Shannon. On one occasion, Wetzold was accompanied by Lewis County Prosecuting Attorney Jeremy Randolph, who explained some of the legal possibilities that Miller might face. At the outset of each discussion, Wetzold read Miller the *Miranda* rights, which Miller waived. During no discussion did Miller request an attorney of his own. Wetzold tape recorded some but not all of Miller's statements, and he included some but not all of those statements in his police reports.
>
> On May 8, 2001, the State charged Miller with aggravated murder in the first degree and unlawful possession of a firearm in the first degree. Miller moved to suppress his statements, and on December 7, 2001, Wetzold, Shannon, and Miller all testified at a CrR 3.5 [suppression] hearing. At the end of that hearing, the trial court found that Miller had given his statements after validly waiving his *Miranda* rights. The court also found that the officers were credible; that Miller was not; that no one had threatened or made any "deals" with Miller; and that Miller had acted voluntarily, without coercion or other improper influence.
>
> [Omitted].
>
> Miller contends that his pretrial statements were involuntary because (1) he was given misleading legal advice and (2) the State used "overbearing" interrogation techniques. [Footnote omitted]. As a result, he says, his statements were inadmissible despite the State's compliance with *Miranda*.
>
> Although we recognize that a statement can sometimes be involuntary despite compliance with *Miranda*, we reject Miller's contention regarding legal advice. The trial court did not find as fact that Miller was given or relied on misleading legal advice. We decline to make such a finding in the first instance, for that is not our function. [Footnote omitted] And despite Miller's claim to the contrary, the record does not show, so clearly that reasonable minds could not differ, that he was given and relied on misleading legal advice.

REPORT AND
RECOMMENDATION - 13

> For similar reasons, we reject Miller's contention that the officers, by their interrogation techniques, "overbore" Miller's will to remain silent. The trial court did not make such a finding; we decline to make it ourselves; and the record is not so clear that reasonable minds could not differ. We affirm the trial court's admission of Miller's statements.

Exhibit 7 at 1-3.

After reviewing the record, this court finds the facts relied on in the state court's decision were reasonably applied, and the legal analysis closely follows the federal standards set forth above. The state court reasonably denied Petitioner's claim that his statements made to officers were involuntarily provided. The record shows that Petitioner made several taped statements to officers. He was aware that the statement was being taped and questioning occurred only after *Miranda* warnings were issued.

Moreover, the state court made specific findings of fact, which are presumed correct by this court on review of the habeas petition. 28 U.S.C. §2254(e)(1). The trial court held a suppression hearing to consider the credibility of the officers and the credibility of Petitioner's claim that he understood that he could not be charged with more than a Class C felony if he did not actually do the shooting in this case. The trial court specifically found (i) Petitioner had given his statements after validly waiving his Miranda rights, (ii) the police officers were credible, (iii) Petitioner was not credible, (iv) no one had threatened or made any "deals" with Petitioner, and (v) Petitioner provided his statements voluntarily, without coercion or other improper influence. The federal court must presume these findings correct. Petitioner has failed to present clear and convincing evidence to rebut the presumption of correctness of the state court findings.

REPORT AND
RECOMMENDATION - 14

## CONCLUSION

Based on the foregoing discussion, the Court should deny the petition for writ of habeas corpus. Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See als*o Fed.R.Civ.P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **July 17, 2009**, as noted in the caption.

DATED this 15th day of June, 2009.

_____
J. Richard Creatura
United States Magistrate Judge